**FEDERAL DEATH PENALTY CASE**
**\*\*\*\*EXECUTION SCHEDULED FOR JULY 13, 2020\*\*\*\***

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**DANIEL LEWIS LEE,**
    Movant

vs.

                                         **Criminal Case No. 4:97-cr-00243-JLH-2**
                                         **CAPITAL CASE**

**UNITED STATES OF AMERICA,**
    Respondent.

## MOTION TO ORDER COMPARISON OF DNA

COMES NOW Daniel Lee ("Mr. Lee"), by his undersigned counsel, and hereby respectfully requests that this Court order, on an expedited basis, the mtDNA profile of a hair recovered during the investigation of the above-captioned case be compared to the mtDNA profile of Paul Humphrey, as well as other potential suspects identified by law enforcement in the course of its investigation. This request is being made pursuant to the Fifth and Eighth Amendments of the United States Constitution, 18 U.S.C. § 3600(e)(1)(B), and the All Writs Act, 28 U.S.C. § 1651(a). The reasons supporting this request are set forth below. A proposed order is attached.

### INTRODUCTION

In 1999, Mr. Lee and co-defendant Chevie Kehoe[1] were tried jointly in the Eastern

---

[1] Throughout this motion, "Mr. Kehoe" refers to Chevie Kehoe. To avoid confusion, the pleading refers to other members of the Kehoe family (primarily, Kirby and Cheyne Kehoe) by either their full names or their first names only. "Mrs. Kehoe" refers to Gloria Kehoe.

Citations to the consecutively-paginated trial transcript are designated as "Tr." Citations to documents filed in the district court docket in this case are designated as "Dkt." Citations to the attached exhibits are designated as "Exh."

District of Arkansas, and were convicted of violating and conspiring to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959—those of William Mueller, his wife Nancy, and her eight-year-old daughter Sarah Powell of Tilly, Arkansas.

The Government's theory of the case was that Mr. Lee and Mr. Kehoe committed the crime after dressing up in FBI uniforms and entering the Mueller home under the pretense of carrying out a raid.[2] It introduced into evidence an FBI raid cap worn by one of the perpetrators, as well as a hair recovered from the cap, and told the jury that "the evidence establishes that *that was Danny Lee's hair*." Tr. 7000-01 (emphasis added).

This was not true.

*DNA testing of the hair*

In 2006, during the § 2255 proceeding in this case, the Court ordered post-conviction DNA testing of the hair. *See* Dkt. 1121. An independent laboratory conducted the testing and conclusively excluded Mr. Lee as the source of the hair recovered from the FBI cap worn by the perpetrator. *See* Exh. 1.

The results of that test demand further exploration: if that wasn't Mr. Lee's hair, then whose was it?

The Government has the ability to potentially answer this question. During the course of

---

[2] The source of this information was the Government's two main cooperating witnesses, Cheyne Kehoe (who claimed Mr. Kehoe confessed to him), and Gloria Kehoe (who claimed both Mr. Kehoe and Mr. Lee confessed to her). The prosecution made much of this testimony. *See* Tr. 1253-54, 1272 (noting in opening statement that Mr. Lee and Mr. Kehoe were seen with FBI raid gear, including cap and jackets, before they left Arizona for Oklahoma; that they wore the "raid gear" in the Mueller home; and that a raid cap was later recovered by authorities from Mr. Kehoe's vehicle); Tr. 6784 (arguing in closing that Mr. Lee and Mr. Kehoe "dressed as law enforcement officers" and "laid in wait in the Mueller home waiting for the Muellers to arrive.").

2

the pre-trial investigation, it collected hair and biological samples from a number of possible suspects. Among them was Paul Edward Humphrey. Initially, he was the lead suspect in this case—and with good reason.

*Paul Humphrey*

Mr. Humphrey lived in Pope County, not far from the Muellers. He became a suspect after Nancy Mueller's brother, David Branch, informed Pope County authorities on February 22, 1996, that Paul Humphrey was in possession of the title documents to the Muellers' abandoned Jeep and trailer.[3] (The Muellers' vehicles were found on property that belonged to Mr. Humphrey.[4]) Mr. Branch had previously seen those documents, unsigned, in the Mueller residence on February 2, after the family had already been reported as missing from their home. Although Mr. Humphrey initially agreed to cooperate with Pope County law enforcement when they contacted him on February 22, he spent the next several months dodging authorities and offering increasingly bizarre, and false, explanations for why he couldn't turn over the titles:

- On March 1, Mr. Humphrey told authorities he'd been advised by his attorney in Russellville, Dale Braden, not to surrender the documents. Authorities contacted Mr. Braden a few days later and learned that Mr. Humphrey had lied to them: he had never retained Mr. Braden or otherwise consulted him about those titles.

- On March 15, Mr. Humphrey claimed he didn't have the documents because he'd given them to a friend in Little Rock. He refused to identify who this "friend" was, but agreed to get the documents and give them to authorities.

---

[3] Details of the investigation into Mr. Humphrey are taken from the search warrant affidavit sworn to on August 27, 1996, by Aaron Duvall, an officer with the Pope County Sheriff's Office. *See* Exh. 2. Many of the same facts are recounted in the Eighth Circuit's opinion denying Mr. Humphrey's suppression motion. *United States v. Humphrey*, 140 F.3d 762 (8th Cir. 1998).

[4] *See* Exh. 3. Mr. Humphrey made incriminating remarks to several witnesses about his familiarity with the backroads that led from the Mueller home to the precise location in Dover, off Highway 7, where the Muellers' vehicles were found. *See* Exhs. 4 & 5.

- After he failed to keep his agreement, authorities contacted Mr. Humphrey again on March 26. This time, Humphrey told authorities that the documents were now with a *different* attorney he'd retained in Little Rock. When authorities contacted that lawyer to verify his story, they found out they'd been lied to yet again: the attorney had no idea who Mr. Humphrey was, much less knew anything about the Mueller titles.

- On April 8, authorities met with Mr. Humphrey and confronted him with his most recent lie. Mr. Humphrey now claimed that he had never actually given the documents to the attorney in Little Rock, but that he only had considered doing so. Instead, he gave the documents to a friend, whom he again refused to name.

It wasn't until three months later, after the Muellers' bodies were recovered, that Pope County authorities eventually followed up with Mr. Humphrey again and finally got the titles from him. When authorities submitted those documents for forensic examination along with known writing samples of William and Nancy Mueller, they finally realized why Mr. Humphrey had been evading them: the signatures on the titles were forged.[5]

After this belated discovery, local authorities spent the next several months steadily gathering evidence that implicated Mr. Humphrey in the Mueller murders, including the following:

- *Mr. Humphrey flunked a polygraph examination.*[6] On January 21, 1997, the Arkansas State Police administered a polygraph examination to Mr. Humphrey in order "to determine his knowledge involvement in the reported homicide of Bill and Nancy Mueller." Exh. 8. Mr. Humphrey was asked whether he was present when the Muellers were killed; whether he participated in disposing of the Muellers' bodies; and whether he knew that the titles to the Muellers' vehicles that he had in his possession were forged. *Id.* The Arkansas State Police polygraph examiner concluded in his report that Mr. Humphrey had lied in his responses to these questions

---

[5] *See* Exh. 6.

[6] Pending before this Court is Mr. Lee's *Motion for Relief from Judgment or Order Pursuant to Fed. R. Civ. P. 60* (Dkt. 1363) and corresponding *Reply* (Dkt. 1374), which alleges that that the Government improperly suppressed the polygraph report, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and presented false and misleading testimony about Mr. Humphrey's involvement in the Mueller murders, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972).

and that he was, in fact, involved in the murders. *Id.*

- *Mr. Humphrey was seen with the Muellers after their disappearance.* Mary Reid, a friend of the Muellers, contacted authorities shortly after the bodies were recovered in late June of 1996. She told them that on January 18, 1996, she was exiting a bank in Russellville when she heard Nancy Mueller call her name. She turned and saw Ms. Mueller seated in the passenger side of a tan colored vehicle. She walked over to the car and engaged Ms. Mueller in conversation. She saw that Mr. Mueller was in the backseat, flanked by two other men. She also saw the driver of the vehicle, whom she later identified in a photo spread as being Mr. Humphrey. Ms. Reid's account was corroborated by bank records and surveillance camera footage that confirmed she was at the bank on that date. Bank records also corroborated Mr. Humphrey's presence in Russellville on that date. Ms. Reid also positively identified Mr. Humphrey's vehicle after driving in his neighborhood and seeing the car parked on the side of the street. Exh. 2 at ¶ 13; *United States v. Humphrey*, 140 F.3d 762, 764 (8th Cir. 1998).

- *Mr. Humphrey was in possession of Nancy Mueller's personal belongings.* Authorities conducted a search of Mr. Humphrey's home on August 30, 1996. They discovered a pamphlet belonging to Nancy Mueller with her signature and address written on it. Tr. 5893-94.[7]

- *Mr. Humphrey made inculpatory statements after the Muellers' disappearance.* In September of 1996, authorities interviewed Dr. Charles Turner and Roberta Turner, close friends of the Muellers, and learned that Mr. Humphrey had made several odd and incriminating comments to them after the Muellers disappeared. *See* Exh. 7. He came by their home on January 25, 1996 and "tried to convince Dr. Turner that the Muellers were okay. He was trying extra hard to convince the Turners that the Muellers were fine." *Id.* at 2. He came by a second time a few weeks later in mid-February, but this time told Mrs. Turner: "*Nancy and Bill was one thing but I really felt bad about Sarah.*" *Id.* (emphasis added).[8] When Mrs. Turner asked him to explain what he meant, Mr. Humphrey changed the subject.

---

[7] Notably, the Government pointed to similar evidence in its closing arguments—that a book belonging to Nancy Mueller was found at Mr. Kehoe's property—to claim that its theory of the case was correct. *See* Tr. 6826 ("One of the things, by the way, that came from Idaho was Nancy Mueller's book."); *id.* at 7005 ("And the whole concept that all of the proof that the government has is just from these two witnesses, Cheyne Kehoe and Gloria Kehoe, is wrong. They don't have anything to do with finding the book -- Nancy Mueller's book 'August Celebration' on his property on the Priest River. They don't. They did that completely independent of these two people. But that's great proof. He [Chevie Kehoe] stole her book.").

[8] At that point in time the Mueller family was missing and not presumed dead: many believed Bill Mueller had taken his wife and step-daughter "off the grid." Mr. Humphrey did not clarify why he would have felt "bad about Sarah."

5

> *Id.* On another visit to the Turners, Mr. Humphrey told them that there "wasn't any money at the Muellers' house when he [Humphrey] went there." *Id.* When Mrs. Turner asked him what money he was talking about, he changed the subject. *Id.*

- *Mr. Humphrey knew details only a perpetrator would know.* Mr. Humphrey claimed at trial that the last time he'd had any contact with the Muellers was by phone on the evening of January 10, 1996, the day before they allegedly went missing. Tr. 6148. But when he was interviewed by police after the Muellers went missing, he described the clothes they wore when he last saw them, which matched the clothes later found on their bodies. *Humphrey*, 140 F.3d at 764.

- *Mr. Humphrey was intimately familiar with the location where the bodies were recovered.* Authorities learned that Mr. Humphrey was a proficient skin diver with experience diving in Lake Dardanelle where the Muellers' bodies were recovered. He tried to deny this when examined on the stand, but quickly back-pedaled after he was confronted with his prior inconsistent statement to law enforcement. Tr. 6191-92.

Federal authorities took the case over from local law enforcement shortly after Cheyne Kehoe began his cooperation in June 1997. Despite the substantial evidence that had already been gathered by that point implicating Mr. Humphrey, the Government nevertheless shifted gears and concentrated its efforts on proving the theory of the case provided to it by Cheyne, and later Gloria Kehoe: that Mr. Lee was involved in the murders. Yet the Government was never actually able to rule out Mr. Humphrey's involvement in the crime. It continued to collect evidence from him for analysis,[9] and still listed him as a suspect on various requests for forensic testing, *as late as March 2, 1999*—after jury selection had already commenced and nearly a week before opening statements. *See* Exh. 9.

After the DNA results came back in 2007 excluding Mr. Lee, the Government never took the next logical step: testing the other suspects' biological samples in its possession, including

---

[9] For example, on October 10, 1997, the Government sought to obtain a hair sample from Mr. Humphrey. *See* Exh. 10.

6

Mr. Humphrey's hair sample, to look for a potential match. According to the Government, that hair belongs to a perpetrator of the offense. The Court, the public, and the victims should know who that was.

*Federal law on DNA testing*

In 2016, Congress amended the federal post-conviction DNA testing statute, 18 U.S.C. § 3600, to mandate that if a defendant is excluded as the source of a DNA sample, then the Court "shall" order the Government to "determine whether the DNA profile matches a profile of a known individual or a profile from an unsolved crime." *See* 18 U.S.C. § 3600(e)(1)(B). Because Mr. Lee was excluded as a contributor of the hair introduced at his trial against him, he now respectfully requests that, pursuant to § 3600(e)(1)(B), and the All Writs Act, 28 U.S.C. § 1651(a),[10] this Court order relevant testing to determine whether the DNA profile of the hair recovered from the FBI cap matches the DNA profile of the other known primary suspects and alleged conspirators in this case.

Under the Due Process Clause of the Fifth Amendment, prisoners like Mr. Lee have a constitutionally protected liberty interest in post-conviction DNA testing as conferred by statutes such as 18 U.S.C. § 3600. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557

---

[10] The purpose of the All Writs Act is "to supply the courts with the instruments needed to perform their duty[.]" *Harris v. Nelson*, 394 U.S. 286, 300 (1969). Specifically, "courts may rely upon this statute in issuing orders appropriate to assist them in conducting factual inquiries." *Id.* at 299. A district court "may rely on the All Writs Act to control actions or conduct that would inhibit its ability to resolve or manage a case before it." *Rubin v. Smith*, 882 F. Supp. 212, 219 (D.N.H.1995) (citation omitted). *See, e.g., United States v. Li*, 55 F.3d 325, 329 (7th Cir. 1995) (upholding issuance of All Writs Act order directing collection of handwriting exemplars); *United States v. Kenney*, 550 F.Supp.2d 118, 122-23 (D. Maine 2008) (granting request under All Writs Act to direct defense to send blood sample to different independent laboratory for testing); *United States v. Jackman*, No. 96–40069–02–SAC, 1997 WL 161948 (D. Kan. Mar. 28, 1997) (Memorandum and Order) (granting defense request pursuant to All Writs Act for production of handwriting exemplars).

U.S. 52, 68, 70 (2009) (post-conviction DNA testing statutes such as § 3600(a) create a protected liberty interest); *see also Skinner v. Switzer*. 562 U.S. 521. 540 (2011) ("[F]or the purposes of the Due Process Clause, the process of law for the deprivation of liberty comprises all procedures-including collateral review procedures--that establish and review the validity of a conviction.").[11] Indeed, as Chief Justice Roberts explained in *Osborne*: "DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty." 557 U.S. at 55.

The Government should be ordered to do everything in its power to determine whose hair was in the FBI cap it claimed was worn during the crime. The Government will suffer no prejudice if this Court grants Mr. Lee's request. Comparing the DNA profile of the hair to existing profiles is easily accomplished by the Government (and in fact frequently done). Any necessary testing of biological material can be completed expeditiously (likely in less than one week) and it can be completed at a fully accredited DNA laboratory with the expenses paid by Mr. Lee's counsel so as to incur no cost to the prosecution. Mr. Lee has argued repeatedly that the prosecution withheld exculpatory evidence and otherwise misrepresented the case to the jury. At every turn the Government has attempted to throw up procedural roadblocks to the truth. There is no such block to argue when it comes to § 3600 testing. It can and should be done.

---

[11] Recognizing that a convicted criminal "does not have the same liberty interests as a free man," *Osborne*. 557 U.S. at 68, and that "[t]he State ... has more flexibility in deciding what procedures are needed in the context of postconviction relief," *id*. at 60, the Supreme Court nevertheless held that a prisoner's limited liberty interest is infringed where "the State's procedures for postconviction relief 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Id*. (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)). Moreover, it is not necessarily sufficient that a state follows its own procedures, because "[t]his 'state-created right ... beget[s] yet other rights to procedures essential to the realization of the parent right.'" *Id*. at 68 (citation omitted).

I. **Background relevant to the request.**

On October 26, 2006, by agreement of the parties, this Court entered an Order directing the Government to submit the hair recovered from the FBI raid cap, as well as a sample of Mr. Lee's hair collected by law enforcement, to the Serological Research Institute (SERI), an independent laboratory, for DNA testing.[12] In this case, the hair recovered from the cap did not have a root.[13] The laboratory, therefore, was required to conduct mitochondrial DNA (mtDNA) testing rather than autosomal (or nuclear) DNA testing.[14]

The laboratory successfully extracted a mtDNA profile from the hair recovered from the cap and also created a mtDNA profile for Mr. Lee based on the sample the Government had previously collected from him as part of its pre-trial investigation.[15] As noted, these two profiles did not match, and Mr. Lee was excluded as a possible source.[16]

The mtDNA profile of the hair recovered from the FBI raid cap is maintained by SERI in a digital format under case number M'7094'06.[17] This means that it can be compared against the mtDNA profile of any other individual to determine whether there is a "match."

During the course of its pre-trial investigation, the Government collected hair and other biological samples from several suspects, including Paul Humphrey. *See* Exh. 10. *See also* Tr. 3654 (noting that hair samples were collected from Cheyne Kehoe and Paul Humphrey). Upon information and belief, biological samples were also collected from Kirby Kehoe and Faron

---

[12] Dkt. 1121.
[13] Exh. 1 at 1.
[14] *Id*. at 3.
[15] *Id*. at 1-2.
[16] *Id*. at 4. The § 2255 court did not grant relief due to the other evidence in the case. Since then, however, Mr. Lee has presented facts showing that the prosecution's chief witness suffered from auditory hallucinations; challenging the existence of a "RICO" conspiracy; and inculpating the defense's chief suspect.
[17] *Id.* at 1.

9

Lovelace, who were indicted and arrested as co-conspirators.[18]

To the undersigned's knowledge, the Government has not sought to extract the mtDNA profiles from these samples and compare them to the known mtDNA profile of the hair from the FBI cap.

## II. Further DNA analysis is required in Mr. Lee's case by statute.

Post-conviction DNA testing thus far has determined definitively that Mr. Lee was *not* the source of the hair recovered from the FBI cap. This result, however, should not end the inquiry. As noted, the amended federal post-conviction DNA testing statute creates additional requirements if the testing results exclude the defendant as the source of a tested sample. Pursuant to the updated statute, the court "shall" order law enforcement to determine whether the DNA profile "matches a profile of a known individual or a profile from an unsolved crime." 18 U.S.C. § 3600(e)(1)(B)(i).

Because the National DNA Index System (NDIS), which is a part of the Combined DNA Index System (CODIS), collects and stores DNA profiles from criminal investigations as well as convicted inmates, the statute directs that a search be conducted in NDIS for a match. *Id*. However, that database currently only allows for searches of *nuclear* DNA profiles in criminal cases, not mtDNA profiles.[19] Thus, the mtDNA profile of the hair recovered from the FBI hat is not compatible with the CODIS and therefore cannot be run through that database in search of a

---

[18] Additionally, Cheyne Kehoe and Kirby Kehoe were arrested and convicted in 2014 of federal weapons charges in the District of Arizona. *See USA v. Kirby Kehoe et al,* No. 3:13-cr-08223-GMS (D. Ariz.). Per federal law, Cheyne and Kirby Kehoe were subject to mandatory DNA collection and those biological samples were provided to the FBI. *See* 28 CFR § 28.12.

[19] *See* Combined DNA Index System (CODIS) Brochure at 2 ("Forensic profiles are searched based on results obtained from nuclear DNA analysis using the 13 core CODIS STR loci."); *id*. ("CODIS allows for the entry of mtDNA only in the missing persons related indexes."), available at https://www.fbi.gov/file-repository/combined-dna-index-system-codis-brochure.pdf/view (last visited June 19, 2020).

match.

That database, however, is not the sole means of identifying a match: mtDNA profiles can be extracted from the alternate suspects' biological samples in the Government's possession, just as was done with Mr. Lee's hair sample. The mtDNA profiles from these individuals can then be compared to the known mtDNA profile of the hair recovered from the FBI cap.

### III.     Request for testing.

Mr. Lee requests this Court order the Government to allow the comparison of the mtDNA profile from the hair it recovered with the mtDNA profiles of other potential suspects. Specifically, Mr. Lee requests that the Government:

> 1) Search its files, databases, or other logs to determine whether a mtDNA profile has already been created for Paul Humphrey, Cheyne Kehoe, Kirby Kehoe, and Faron Lovelace. Because biological evidence was presumably collected from all of these suspects in this (and other) cases, the Government may already have mtDNA profiles of these individuals. If so, it would be a simple matter of comparing the paper documents to determine if the base positions that were tested for these persons match those of the recovered hair.[20]
>
> 2) Send previously-collected biological samples from these individuals, if no existing mtDNA profiles are found, to SERI for the necessary testing and comparison to the known mtDNA profile of the hair recovered from the FBI cap. This is the same process and lab the parties agreed to use for the initial testing in 2006. Alternately, the samples can be sent to a different laboratory for mtDNA testing, provided that testing is conducted on the same base positions so that they can be compared to the known mtDNA profile of the hair recovered from the cap.

*Any additional mtDNA testing can be conducted in as few as five (5) business days*.[21] The expenses will be paid by Mr. Lee's counsel and it would proceed at no cost to the prosecution.

---

[20] As noted in the SERI report, the relevant base positions are Hypervariable Region I (HVI) (positions 16018-16374), and Hypervariable Region II (HVII) (positions 71-365). *See* Exh. 1 at 2.

[21] *See* Serological Research Institute, http://www.serological.com/dna-forensic-testing.php (last visited June 19, 2020).

### IV. A match of the hair DNA with another suspect would be directly relevant to the issues in Mr. Lee's case.

The only forensic evidence directly tying Mr. Lee to the crime was that hair found on a cap worn by one of the perpetrators, which the Government assured the jury was a match for Mr. Lee's hair. Tr. 7000-01.[22] That hair (and the FBI "raid gear" cap it was found on) was prominently featured at trial and the prosecution repeatedly referred to it in its opening statement. *See* Tr at 1253; 1254; 1272.

During the guilt phase, an expert from the Arkansas State Crime Laboratory testified that the hair was microscopically similar to Mr. Lee's hair. Tr. 4722. But by closing argument, the Government had abandoned all nuance and forcefully argued that "the evidence establishes that *that was Danny Lee's hair.*" Tr. 7000-01 (emphasis added).

There is no question the hair evidence played a key role in the Government's case against Mr. Lee. But we now know definitively that hair was not his. Excluding Mr. Lee, however, is only one benefit of the science of DNA. DNA testing can also identify the actual contributor of the hair.

Mr. Lee has maintained since trial that the investigation of the Mueller murders was flawed. Despite ample evidence connecting Mr. Humphrey to the Muellers' disappearance, law enforcement failed to timely pursue available leads against him until months later when the

---

[22] The Government also attempted to link Mr. Lee to the crime via a fingerprint lifted from a display case belonging to the Muellers that was recovered in a storage unit at the Shadows Motel in Spokane, WA. Tr. 7001. But as was pointed out at trial, Mr. Lee frequently *slept* in that storage unit and had multiple opportunities to come into contact with the display case. Tr. 2856-57; 2915; 4815; 5312; 6878; 6946-47. Even the Government's own fingerprint expert testified there was no way to determine the age of a print or when it might have been deposited on the display case. Tr. 3716. Although the Government points repeatedly to the fingerprint as evidence of culpability, it had no probative value as to whether Danny Lee was at the crime scene.

Muellers' bodies were recovered.[23] Even after the federal government formally took over the prosecution, Mr. Humphrey was never ruled out as a suspect.[24] The Government simply adopted a different theory of the case, provided by its cooperating witnesses, Gloria and Cheyne Kehoe. That theory, however, did not tie up the various loose ends implicating Mr. Humphrey. Indeed, as we now know, the Government not only ignored evidence that didn't fit its theory, it buried a polygraph examination administered by the Arkansas State Police that demonstrated Mr. Humphrey lied about his participation in the murders.[25]

A match of the mtDNA profile of the hair recovered from the cap with Mr. Humphrey would be directly relevant to the third-party culpability defense Mr. Lee presented at trial. Moreover, it would support his contention that the testimony of Gloria and Cheyne Kehoe, on which the Government's case against him hinged, was false. For example, their account of the crime depended on a very precise timeline in order for Mr. Lee to have been involved: he was seen back in Spokane, Washington at least as early as January 13, 1996, so he could not have been in Tilly, Arkansas any later than January 11, 1996.[26] And as the Government has already conceded, if there was evidence the murders were committed later than January 11, or that Mr. Lee was in Spokane earlier than the 13th, Mr. Lee could not have been convicted.[27] A DNA match to Mr. Humphrey would do more than simply implicate him in the crime, it would also undermine the timeline; it would bolster the testimony of a disinterested witness, Mary Reid, who saw Mr. Humphrey with the Muellers on *January 18*, 1996,[28] long after Mr. Lee had

---

[23] Dkt. 1363 at 43-47, 49, 52-55, 59-60.
[24] *Id*. at 46.
[25] *Id*. at 47-49. *See also* Dkt. 1374 at 27-29.
[26] Dkt. 1363 at 27-33.
[27] *See* Dkt. 1126-1 at 33 ("Had the jury not accepted the government's time line, Lee could not have been convicted.").
[28] Dkt. 1363 at 33, 45.

returned to the west coast. Thus, Mr. Humphrey's guilt cannot be harmonized with the Kehoes' testimony or the Government's theory of the case.

Indeed, a match with any of the alternate suspects in this case would radically undermine the Kehoes' testimony about Mr. Lee and directly contradict the Government's trial presentation. For example, Mrs. Kehoe provided an alibi for Kirby Kehoe, who was a suspect in the murders due to his involvement in the burglary of the Mueller home in 1995. Despite admitting that she had overheard Kirby discuss plans with Chevie Kehoe in January of 1996 to rob the Muellers again, Tr. 5134, Mrs. Kehoe testified that Kirby was with her in Arizona in January of 1996 and never travelled to Arkansas. Tr. 5137-38. However, before she began cooperating in this case and pinned the blame on Mr. Lee, Mrs. Kehoe told a confidential informant of the ATF that Kirby had, in fact, been in Arkansas that January. *See* Exh. 11 at 1. If Kirby Kehoe's DNA matched the hair DNA profile, it would not only suggest he was involved in the crime but would also prove that Mrs. Kehoe perjured herself on the stand.

The same is true of Cheyne Kehoe. If he were implicated by DNA testing, it would not only render his and Gloria Kehoe's testimony utterly incredible, it would also explain why their respective statements to law enforcement were so inconsistent and conflicted with the physical evidence, the testimony of disinterested witnesses, and each other.[29] Indeed, Cheyne would have had a clear motive to lie about his involvement. At the time of his cooperation, he had just turned himself in for the attempted murder of two Ohio police officers–a case so notorious that it landed him on the FBI's "most wanted" list[30]--and knew he was already looking at a lengthy prison sentence. Implicating someone else in the Mueller murders not only would have allowed him to

---

[29] *Id.* at 18-21.
[30] *Id.* at 16-17.

escape liability for that crime, he could also leverage his cooperation in helping authorities "solve" the Mueller murders to reduce his Ohio sentence (which he in fact did).[31]

Finally, there is Faron Lovelace. He met Chevie Kehoe at the notorious Elohim City in Oklahoma[32] and lived in the secluded mountains of Idaho with his wife, near where the Kehoe family sometimes stayed.[33] According to the original indictment, several of the underlying predicate federal racketeering acts were committed by Mr. Lovelace, at the direction of Chevie and Kirby Kehoe.[34] For reasons that have never been explained on the record, the Government withdrew the charges against Mr. Lovelace with the filing of the superseding indictment. It now identified him as an unindicted co-conspirator, but still described his "function" in the alleged enterprise as "among other things, to commit the murder of one person, carry out a robbery, and to assist in the transportation of stolen property from state to state," and detailed his role in these racketeering acts.[35]

Significantly, in January of 1997, Mr. Lovelace made an incriminating phone call to local law enforcement attempting to find out whether authorities had any evidence connecting him to the Mueller murders, as well as inquiring if Paul Humphrey had been located and charged with

---

[31] *Id.* at 17.

[32] Elohim City was the subject of much testimony at the trial because it was believed to be an enclave for armed extremists who were adherents of the Christian Identity movement.

[33] *See* Bill Morlin, "Undying Love Mountain Woman Stands By Killer Husband," The Spokesman-Review, Aug. 24, 1997, available at: https://www.spokesman.com/stories/1997/aug/24/undying-love-mountain-woman-stands-by-killer/ (last visited June 19, 2020).

[34] Dkt. 1.

[35] Dkt. 195. Mr. Lovelace was sentenced to death in Idaho State court for the murder of Jeremy Scott, which was Racketeering Act 3 of the superseding indictment. (The jury issued an acquittal on that racketeering act at Mr. Lee's and Mr. Kehoe's joint guilt-phase proceeding. *See* Dkt. 1363 at 21.) Mr. Lovelace's death sentence was subsequently vacated, and he was re-sentenced to life without possibility of release. It is the undersigned's understanding that Mr. Lovelace passed away while in custody serving his life sentence.

anything.[36] He also suggested during that call that he had knowledge of Kirby's involvement in the murders.[37] (Notably, however, Mr. Lovelace confirmed that he did not know and had never met Mr. Lee.[38]) A DNA match to Mr. Lovelace would not only implicate him in the crime, but it would indicate that the Kehoes did not testify truthfully about who committed the Mueller murders—perhaps for the benefit of the patriarch of the family, Kirby, whom Cheyne and Gloria were demonstrably trying to protect while on the stand.

## CONCLUSION

The Government's case against Mr. Lee was problematic from the start. With the passage of time, it has only become substantially weaker.[39] There is strong reason to believe that the DNA profile extracted from the hair introduced at trial might actually match that of one of the other suspects in this case. If there were such a match, it would be powerful evidence undermining the Government's prosecution theory against Mr. Lee. DNA comparison in this case is not only consistent with the recent amendments to the federal post-conviction DNA statute but is also in the Government's interest in Mr. Lee's case. As Chief Justice Roberts has explained, DNA evidence can do more than just exclude; it can also identify a perpetrator. Because Mr. Lee was excluded as a source of the hair introduced at trial, it is in the Government and the public's interest to learn whose hair it really was.

Given the stakes in this litigation and the Government's desire to execute Mr. Lee imminently, there is no compelling reason to forgo this testing.

---

[36] *See* Exh. 12 at 1.
[37] *Id.* at 2.
[38] *Id.*
[39] Dkt. 1363 at 15-59.

Respectfully submitted this 19th day of June, 2020.

| | |
|---|---|
| MORRIS H. MOON | GEORGE G. KOUROS |
| Bar Number 24032750 (TX) | Bar Number 420813 (CT) |
| Attorney for Daniel Lee | Attorney for Daniel Lee |
| Assistant Federal Public Defender | Assistant Federal Public Defender |
| Federal Capital Habeas Project | Federal Capital Habeas Project |
| 6411 Ivy Lane, Suite 710 | 6411 Ivy Lane, Suite 710 |
| Greenbelt, MD 20770 | Greenbelt, MD 20770 |
| Telephone: (713) 880-3556 | Telephone: (301) 821-0855 |
| Email: Morris_Moon@fd.org | Email: George_Kouros@fd.org |

**CERTIFICATE OF SERVICE**

      I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on June 19, 2020. This motion was served via this court's CM/ECF electronic case filing system upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

MICHAEL GORDON
JONATHAN D. ROSS
SHANNON S. SMITH
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
michael.gordon@usdoj.gov
Jonathan.D.Ross@usdoj.gov
shannon.smith@usdoj.gov

                                                            GEORGE G. KOUROS
                                                            Bar # 420813 (CT)
                                                            Attorney for Daniel Lee
                                                            Assistant Federal Public Defender
                                                            Federal Capital Habeas Project
                                                            6411 Ivy Lane, Suite 710
                                                            Greenbelt, MD 20770
                                                            Telephone: (301) 821-0855
                                                            Email: George_Kouros@fd.org

# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

**DANIEL LEWIS LEE,**
    **Movant**

vs.

                                        **Criminal Case No. 4:97-cr-00243-JLH-2**
                                        **CAPITAL CASE**

**UNITED STATES OF AMERICA,**
    **Respondent.**

## ORDER

Pending before the Court is defendant Daniel Lee's motion to order comparison of DNA (Dkt. ___). For good cause shown, the request is granted.

The Government is ordered to search its files, databases, or other logs to determine whether a mtDNA profile has already been created for Paul Humphrey, Cheyne Kehoe, Kirby Kehoe, and Faron Lovelace. If any documents identifying the mtDNA profiles of these individuals exist, the Government is ordered to produce those documents to counsel for Mr. Lee no later than _____.

If no mtDNA profiles for these individuals are found, the Government is ordered to send previously-collected biological samples from these individuals to the Serological Research Institute (SERI) for the necessary testing and comparison to the known mtDNA profile of the hair recovered from the FBI cap. This is the same process and laboratory the parties agreed to use for the initial testing in 2007. Alternately, and by agreement of the parties, the samples can be sent to a different laboratory for mtDNA testing, provided that testing is conducted on the same base positions so that they can be compared to the known mtDNA profile of the hair recovered from the cap. The cost of testing will be borne by Mr. Lee's counsel.

2

It is so ordered this ___ day of _____, 2020

_____
Kristine G. Baker
United States District Judge