**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**CAPITAL CASE**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**


**v.**                              **Case No. 4:97-cr-00243-LPR-2**


**DANIEL LEWIS LEE**                                                  **DEFENDANT**

## ORDER

Daniel Lewis Lee is a federal death-row inmate.  The Director of the Federal Bureau of

Prisons, upon direction of the Attorney General, has scheduled Mr. Lee's execution for Monday,

July 13, 2020.  (Doc. 1379).  A District Court in the Southern District of Indiana has (yesterday)

preliminarily enjoined the execution.  The United States has taken an emergency appeal to the

Seventh Circuit.  That appeal is still pending.

Before the Court is Mr. Lee's Motion to Order Comparison of DNA.  (Doc. 1387).  The

Motion is one of several motions that have recently been filed by Mr. Lee.  The Motion was filed

on June 19, 2020, after the Government had set Mr. Lee's execution date.  (Doc. 1387).  On June

26, 2020, the Government responded to the Motion.  (Doc. 1398).  On June 30, 2020, Mr. Lee

replied.  (Doc. 1399).  On July 6, 2020, Judge Baker recused from this case, and it was randomly

reassigned to me.[1]  For the following reasons, Mr. Lee's Motion is denied.

---

[1] I have spent this week both getting up to speed on the entire case file (over 1400 docket entries) and evaluating the pending emergency motions.  With respect to the Motion being decided today, I have closely and carefully studied and weighed each of the party's arguments and sub-arguments, all cited authorities (caselaw, statutes, etc.), and all supporting exhibits and reports.  Only the press of time has prevented me from writing in a more detailed manner on this Motion.

## OVERVIEW

In a 1999 trial over which the Honorable G. Thomas Eisele presided, Chevie Kehoe and Mr. Lee were convicted of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and of three murders in aid of racketeering in violation of 18 U.S.C. § 1959(a)(2). The victims were William Mueller, Nancy Mueller, and Nancy Mueller's minor daughter, Sarah Powell. During the penalty phase, the jury first decided that Chevie Kehoe should be sentenced to life imprisonment and then, separately, that Mr. Lee should be sentenced to death. The Eighth Circuit affirmed Mr. Lee's conviction and death sentence. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied* 545 U.S. 1141 (2005). Since that time, Mr. Lee has filed a slew of ultimately unsuccessful petitions and motions seeking relief from his conviction, his death sentence, and his scheduled execution.

In his current Motion, Mr. Lee requests that this Court order, on an expedited basis, the comparison of the mtDNA profile of a small strand of hair used as evidence in this case with the mtDNA profile of Paul Humphrey as well as several other one-time suspects, one-time potential suspects, or persons of interest identified by law enforcement in the course of its investigation. (Doc. 1387 at 1). Mr. Lee makes this request pursuant to the Fifth Amendment of the United States Constitution, 18 U.S.C. § 3600(e)(1)(B), and the All Writs Act, 28 U.S.C. § 1651(a). (*Id.*).

Mr. Lee did not request any mtDNA testing in the lead up to his trial. In connection with his 2006 habeas petition, Mr. Lee requested (and obtained) comparison testing of the mtDNA profile of the small strand of hair with his own mtDNA profile. Mr. Lee's request was focused on trying to exclude himself as a match for the hair, which would in turn assist his argument that trial counsel was ineffective for not doing such mtDNA exclusion testing. In 2006, Mr. Lee did not request a comparison of the mtDNA profile of the small strand of hair with the mtDNA profile of

any other person.  In the 14 years between 2006 and June 19, 2020, Mr. Lee did not request any such testing and comparisons.  Mr. Lee does not explain his failure or refusal to request such testing and comparisons before now, aside from his incorrect belief that the Court should have ordered such testing and comparisons and/or the Government should have done such testing and comparisons without Mr. Lee having to ask for it.  Nonetheless, Mr. Lee's life is on the line.  So the Court takes the Motion at face value and gives it the serious consideration it deserves.

## FACTUAL BACKGROUND

The facts of this case are detailed in the § 2255 Order entered by Judge Eisele.  (Doc. 1163 at 5-17); *United States v. Lee*, No. 4:97-CR-00243-(2) GTE, 2008 WL 4079315, at *2-7 (E.D. Ark. Aug. 28, 2008).  The evidence at trial revealed that Mr. Lee met Chevie Kehoe in late August or early September 1995.  And, in late December 1995 or early January 1996, they embarked on a road trip that took them to Arizona, Oklahoma, and then Arkansas.  After arriving in Arkansas in January 1996, Chevie Kehoe and Mr. Lee robbed and murdered the Mueller family.  Specifically, Chevie Kehoe and Mr. Lee dressed as federal law enforcement officers and entered the Mueller home while the Muellers were out.  When the Muellers returned home, Chevie Kehoe and Mr. Lee overpowered them, robbed them, killed them, and dumped their bodies in the Illinois Bayou near Lake Dardanelle.  There was evidence that the arms of each body had been duct-taped around large rocks.

The robbery was one of a number of criminal activities intended to fund and support Chevie Kehoe's plan to foment revolution and create a white supremacist country in the American Northwest.[2]  Chevie Kehoe and Mr. Lee made off with a large amount of "cash, coins, numerous

---

[2]  Chevie Kehoe ran the white supremacist group.  Mr. Lee was one of his principal assistants.

firearms, firearm parts, gun display cases, and ammunition." Mr. Lee received some of the bounty. The rest was taken by Chevie Kehoe. Some of the stolen items were stored at storage facilities in Montana and Idaho. This included a gun case, on which law enforcement later found Chevie Kehoe's and Mr. Lee's fingerprints.

The Muellers' bodies were not found until June 28, 1996. At the trial, the Government's theory was that the murders were committed in early January 1996, and that Chevie Kehoe and Mr. Lee returned to the Spokane, Washington area within days of the murders. This timeline was important because witnesses placed Mr. Kehoe and Mr. Lee back in Washington "no later than January 14, 1996, at 5:59 p.m."

Government witnesses testified that around December 1996 Chevie Kehoe fled the Spokane area with a mobile home and Suburban, went briefly to Montana with the rest of the extended Kehoe family, and then traveled around the country with his brother, Cheyne Kehoe, their wives, and some of their children. The Kehoe brothers sold the Muellers' firearms at gun shows, and Chevie Kehoe confessed to his brother that he and Mr. Lee murdered the Muellers. Chevie Kehoe showed his brother the raid gear that he and Mr. Lee wore during the murders. This was not the only evidence of confessions in this case. Chevie Kehoe and Mr. Lee also individually confessed to Chevie Kehoe's mother, Gloria Kehoe. And Mr. Lee told an acquaintance, James Wanker, that he had taken a trip "down south" and that some people "had fucked with him and so he wrapped them up, taped them, and [threw] them in the swamp." (Tr. 4082-83). Mr. Lee made similar statements to Mr. Wanker's wife.

Eventually, Chevie Kehoe abandoned the Suburban after a shootout with police. A search of the Suburban revealed federal officer raid jackets, FBI caps, bullet proof vests, guns, various gun parts, ammunition, holsters, handcuffs, and duct tape. The Government introduced into

evidence an FBI cap recovered from the Suburban, as well as a hair recovered from that cap. Chantelle Bequette, a criminalist at the Arkansas State Crime Laboratory, was accepted as an expert in trace-evidence collection and hair and fiber analysis. (Tr. 3646). She testified that the hair from the FBI cap was "microscopically similar to the known hair from Danny Lee." (Tr. 4722).

Ms. Bequette explained that "microscopically similar" means that "the range of characteristics that were observed in the known hair and questioned hair were similar." (Tr. 4722-23). She then clarified that "finding that [the hairs] are similar doesn't necessarily point to a positive identification." (Tr. 4724). Ms. Bequette testified that the hair was "microscopically dissimilar" to sample hairs from William Mueller, Nancy Mueller, Sarah Powell, Paul Humphrey, Chevie Kehoe, Cheyne Kehoe, and Karena Kehoe, who was Chevie Kehoe's wife. (Tr. 4723). She testified that, while the analysis does not "necessarily point to a positive identification" of Mr. Lee as the source of the hair, test results "excluded" these other individuals. (Tr. 4724). On cross-examination, Ms. Bequette agreed that "the hairs do not possess enough individual characteristics to be positively identified as having originated from a particular person." (*Id.*). During closing, the Government referred to Ms. Bequette's testimony:

> But remember Chantelle [Bequette]'s testimony? The reason they have to say similar and can't do a match is there are a couple of probabilities. Number one, people like me with white hair, they don't have enough pigment and characteristics. They are hard to match. But when you get past those people, as you do with Danny Lee, there might be another one out there. Remember, if she took a hair from everybody off the jury and everybody in the courtroom if you eliminated the white-haired people she would be able to match up because we would have had controlled conditions. That was her testimony. But she recognizes that there might be out there someone another hair could match. We recognize that, but here, I submit to you, the evidence establishes that that was Danny Lee's hair. Not just a hair itself but the other proof that is associated with it are associated with him.

(Tr. 7000-01).

Chevie Kehoe and Mr. Lee attacked the Government's theory of the case. Specifically, they asserted that the Government's timeline of events was implausible. They emphasized that, for the Government's theory to work, it required essentially a non-stop dash from Arkansas to Washington. Chevie Kehoe and Mr. Lee also attempted to create reasonable doubt by arguing that other suspects—including Paul Humphrey, Kirby Kehoe,[3] Cheyne Kehoe,[4] and Faron Lovelace[5]— may have been responsible for the murders. The defense case specifically highlighted that the early part of the murder investigation focused on Mr. Humphrey.

Mr. Humphrey lived in the same county as the Muellers. Law enforcement initially focused on him as a suspect after Nancy Mueller's brother reported to local authorities on February 22, 1996, that Mr. Humphrey possessed title documents for a Jeep and trailer owned by William Mueller. *United States v. Humphrey*, 140 F.3d 762, 763 (8th Cir. 1998). Ms. Mueller's brother informed authorities that he had seen those same documents, unsigned, in the Mueller residence on February 2. *Id.* When contacted by law enforcement, Mr. Humphrey admitted to possessing the documents but was evasive about turning them over. *Id.* Mr. Humphrey testified at Mr. Lee's trial that he and Mr. Mueller were friends and had a plan to take their vehicles "from the state out of its hands" by exchanging titles for "pieces of silver." (Tr. 6143, 6154-62). According to Mr. Humphrey, the Muellers' landlord mailed him the title documents after the Muellers went missing. (Tr. 6153, 6176).[6]

---

[3] Kirby Kehoe is Chevie Kehoe's father. Kirby had assisted Chevie in a previous robbery of the Muellers.

[4] Cheyne Kehoe is Chevie Kehoe's brother.

[5] Faron Lovelace was a compatriot of Chevie Kehoe. As part Chevie Kehoe's white supremacist group in Washington, Mr. Lovelace kidnapped and robbed Malcolm and Jill Friedman.

[6] The Court acknowledges Mr. Lee's arguments regarding the results of Mr. Humphrey's polygraph. Judge Baker has recently considered and denied a Rule 60(b) motion that in part raised this same point. I do not believe that the

As noted above, a much more detailed and complete description of the facts are set forth in the § 2255 Order entered by Judge Eisele.  (Doc. 1163 at 5-17); *Lee*, 2008 WL 4079315, at *2-7.  Summarizing all the facts, Judge Eisele noted the following:

> The Court has outlined some of the evidence linking Kehoe and Lee to the Mueller murders in part to demonstrate the abundance of evidence supporting the guilt phase convictions.  Those bare facts alone cannot convey the demeanor of the witnesses who testified, the scope and detail of the Government's evidence, or the general overall tenor of the case against Kehoe and Lee.  While the bulk of the evidence at trial related to Kehoe, the jury's conclusion that Lee was with Kehoe when the Muellers were murdered and that he participated in the murders was well-founded.  As this brief recitation of the facts also demonstrates, there was no question about Kehoe and Lee's respective roles: Chevie Kehoe was the ringleader, and Danny Lee was the follower.

(Doc. 1163 at 17); *Lee*, 2008 WL 4079315, at *7.

In 2006, shortly before filing the 28 U.S.C. § 2255 motion to set aside his conviction, Mr. Lee asked the Court, pursuant to 21 U.S.C. § 848(q)(9) & (10)(B) (repealed 2006), to approve an expenditure for mitochondrial DNA (mtDNA) testing of the hair recovered from the FBI cap and comparison of the hair's mtDNA profile with the mtDNA profile from samples of Mr. Lee's own hair.  (Doc. 1116, *sealed and ex parte*).  Under § 848(q)(4)(B), financially unable petitioners in § 2255 proceedings are entitled to certain services.  These include services found in subsection (q)(9), which provides that "[u]pon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorney to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under paragraph (10)."  21 U.S.C. § 848(q)(9).  In subsection (q)(10)(B), fees

---

polygraph results alter the overwhelming evidence of Mr. Lee's guilt or change the calculus discussed *infra* regarding additional DNA testing.

and expenses for "investigative, expert, and other reasonably necessary services" are limited to

$7,500, absent court certification.  21 U.S.C. § 848(q)(10)(B).

Because the small strand of hair found on the FBI cap had no root, it was impossible to do

nuclear DNA testing.  Only mtDNA testing was possible.  In his § 848(q) motion for authorization

of funding, Mr. Lee referred to the differences between nuclear DNA and mtDNA analysis:

> For a discussion of the differences between mitochondrial DNA and nuclear DNA, *see*, F.A. Castle, *et al.*, "Database Limitations on the Evidentiary Value of Forensic Mitochondrial DNA," 43 AMER.CRIM.L.REV. 53 (2006).  While less discriminating than nuclear DNA in matching suspects to evidence, "Use of mtDNA for exclusion purposes has been widely embraced in the scientific and legal communities . . . ." *Id.* at 54.  It is particularly well-suited for analyzing the mitochondria present in hair shaft samples that do not contain nuclear DNA.  *Id.*  The only thing controversial about mtDNA is whether, because of database limitations, it should be utilized as a matching tool versus an excluding tool.

(Doc. 1116 at 1 n.1).

> Mitochondrial DNA analysis, while not as discriminating in declaring a match as DNA analysis that looks at the nuclear portion of the human cell, can provide an absolute, science-based, exclusion.  An exclusion of Mr. Lee as the source of the hair found on the FBI cap would lend powerful support to the anticipated argument that his counsel were ineffective for failing to seek out such testing.  An exclusion of Mr. Lee as the source of the hair would also constitute powerful evidence of actual innocence.

(*Id. at 3*).  The Court granted Mr. Lee's motion for funding pursuant to 21 U.S.C. § 848(q)(9).

(Doc. 1117, *sealed*).

During the § 2255 proceedings, Mr. Lee challenged his conviction and sentence, in part,

by claiming that he received ineffective assistance of counsel because his trial lawyers failed to

obtain mtDNA testing of the hair from the FBI cap.  (Doc. 1118 at 19-20).  Mr. Lee acknowledged

that, presumably because the recovered hair did not have a root, nuclear DNA testing was not an

option.  Mr. Lee then repeated his argument that mtDNA testing, though "not as discriminating [as

nuclear DNA analysis] in declaring a match," was available, and an exclusion of him as the source of the hair would have "undercut" the Government's case.  (*Id.*).  The Government subsequently filed a motion that stated that the hair recovered from the FBI cap was in the custody of the Bureau of Alcohol, Tobacco, Explosives and Firearms, and asked the Court to order the appropriate special agent to forward that hair, along with samples of Mr. Lee's hair gathered during the investigation, to the facility where the mtDNA testing was being done.  (Doc. 1120).  The Court ordered the materials forwarded for testing.  (Doc. 1121).

In June 2007, an independent laboratory conducted mtDNA analysis of the hair extracted from the FBI cap and Mr. Lee's hair sample.  The test excluded Mr. Lee as the source of the hair. (Docs. 1387-2, 1138-2).  Mr. Lee supplemented his § 2255 motion with the mtDNA test results and related argument.  (Docs. 1138, 1139).  It is undisputed that Mr. Lee did not seek further DNA analysis, or comparison of the mtDNA profile from the hair with the DNA profile from other individuals.

Judge Eisele rejected Mr. Lee's ineffective assistance of trial counsel claim.  Judge Eisele concluded that, regardless of whether Mr. Lee's trial lawyers could be faulted for failing to obtain DNA testing of the hair, Mr. Lee had not shown the required prejudice.  (Doc. 1163 at 49); *Lee*, 2008 WL 4079315, at *25.  Specifically, Judge Eisele stated: "The evidence in this case overwhelmingly supported the jury's finding of guilt.  The Court cannot find that the outcome would have been different if [Mr. Lee's] counsel would have obtained mtDNA testing and disproved [Mr. Lee] as the source of the hair found in the raid cap." (*Id.*).[7]

---

[7]  This ineffectiveness claim was not part of Mr. Lee's appeal of the § 2255 Order.  *United States v. Lee*, 715 F.3d 215 (8th Cir. 2013).

# ANALYSIS

Mr. Lee argues that, because the mtDNA analysis conducted in 2007 during his § 2255 proceedings excluded him as the source of the hair recovered from the FBI cap, this Court should now order additional mtDNA analysis to determine whether the mtDNA profile of that hair matches the profile of any of the following four individuals—Paul Humphrey, Cheyne Kehoe, Kirby Kehoe, and Faron Lovelace.  (Doc. 1387 at 2) ("The results of that test demand further exploration: if that wasn't Mr. Lee's hair, then whose was it?"); (*Id.* at 8) ("The Government should be ordered to do everything in its power to determine whose hair was in the FBI cap it claimed was worn during the crime."); (Doc. 1399 at 4) ("Because there are no procedural barriers that preclude this Court from ordering further DNA testing, this motion should be granted so we can finally know the truth about the source of a crucial piece of trial evidence.").  It is somewhat unclear whether Mr. Lee is arguing that this Court is *required* to order that testing—by either 18 U.S.C. § 3600(e)(1)(B) or the Due Process Clause of the Fifth Amendment—or that this Court *should* order such testing as a matter of its discretion.[8]

If Mr. Lee is arguing that 18 U.S.C. § 3600(e)(1)(B) *requires* the Court to order such testing, his argument is way off the mark.  Even assuming § 3600(e)(1)(B) was triggered in this case, its requirement is only that:

> If a DNA profile is obtained through testing that excludes the applicant as the source and the DNA complies with the Federal Bureau of Investigation's requirements for the uploading of crime scene profiles to the National DNA Index System (referred to in this subsection as "NDIS"), the court shall order that the law enforcement entity with direct or conveyed statutory jurisdiction that has access to the NDIS submit the DNA profile obtained from probative biological material from crime scene evidence to determine whether the DNA profile matches a profile of a known

---

[8]  Mr. Lee makes a passing reference to the Eighth Amendment as well.  (Doc. 1387 at 1).  But he does not develop this argument at all.  So the Court need not address it.

individual or a profile from an unsolved crime.

Mr. Lee acknowledges that the NDIS only allows for uploading of nuclear DNA profiles.[9]  Because the mtDNA profile extracted from the hair on the FBI cap is not compliant with the Federal Bureau of Investigation's requirements for the uploading of crime scene profiles to NDIS, § 3600(e)(1)(B) does not require further testing.  And the statute certainly doesn't require testing outside the NDIS system.  Mr. Lee's argument to the contrary pulls out of context one phrase in this statutory subsection to suggest that the subsection requires the Court to order law enforcement "to determine whether the DNA profile 'matches a profile of a known individual or a profile from an unsolved crime.'"  (Doc. 1387 at 10).  But this argument falls apart upon even a passing glance at the statutory subsection.  Read in context, there is no question that this language is talking about "a known individual or a profile from an unsolved crime" in the NDIS system.  The language is not talking about testing specific individuals hand selected by a defendant.

In any event, it is far from clear that § 3600(e)(1)(B) was triggered.  § 3600(e)(1)(B) is only triggered if the result of DNA testing *performed under § 3600(a)* excludes the defendant as a match.  The Government says that Mr. Lee never did § 3600(a) testing.  (Doc. 1398 at 18).  Mr. Lee says that the DNA testing he asked for in 2006, and was granted in 2007 (which excluded him as a match for the small strand of hair), qualifies as § 3600(a) testing.  (Doc. 1399 at 5-6).  That is highly debatable.  In 2006, Mr. Lee never suggested he was making a § 3600(a) request.  His motion for funds referenced only the statutory funding provision, and the Fifth and Eighth Amendments.  (Doc. 1116 at 2).  Moreover, if he was truly proceeding by way of § 3600(a) at that time, then his 21 U.S.C. § 848(q)(9) & (10)(B) request for funds would have made absolutely no

---

[9]  It should be noted that the distinction between nuclear DNA profiles (which are uploadable to the NDIS system) and mtDNA profiles (which are not) is not an arbitrary distinction.  Mr. Lee himself acknowledges the limitations in relying on mtDNA in "matching suspects to evidence" as opposed to excluding suspects.  (Doc. 1116 at 1 n.1).

sense.   That's because § 3600(c) provides a mechanism for indigent prisoners to obtain Government funding for DNA testing.   So Mr. Lee's funds request is actually a significant indicator that he was seeking testing by means other than 18 U.S.C. § 3600.   There's nothing unusual about that; § 3600(h) makes clear that there exist avenues for DNA testing outside of § 3600.

If DNA testing excludes a defendant as a match for a piece of evidence, why does the applicability of § 3600(e)(1)(B) turn on whether the testing was done under the auspices of § 3600(a)?   The first (and really only) answer is because that's the only way to read the plain language of the statute.   § 3600(e) only deals with "[t]he results of any DNA testing ordered under this section . . . ."   18 U.S.C. § 3600(e)(1)(A).   But beyond that, § 3600 is part of the Innocence Protection Act of 2004.   It is about getting DNA testing to prove actual innocence, not other things like proving ineffective assistance of counsel as part of 2255 proceedings.   The prerequisites identified in § 3600(a) are pegged to a court determining whether or not the testing is really about actual innocence.   And, here, because Mr. Lee was not proceeding by way of § 3600, he never had to prove that he met those prerequisites.[10]   Mr. Lee did not ask the Court to find and the Court did not find the numerous required prerequisites for testing under § 3600(a).   Mr. Lee says this was because the Government agreed to an order for testing, which would have made any request under § 3600(a) unnecessary.   (Doc. 1399 at 6).   But there is no evidence that Mr. Lee would have

---

[10] The Court acknowledges that Mr. Lee's requests for DNA testing funds did in one sentence allege that exclusion of him as the source of the FBI-cap hair "would also constitute powerful evidence of actual innocence."   (Doc. 1116 at 3).   That statement alone, however, was insufficient to bring Mr. Lee's previous motion under the auspices of 18 U.S.C. § 3600.   Mr. Lee did not rely on the mtDNA analysis excluding him as the source of the discovered hair to support an actual-innocence argument in the § 2255 proceedings.   To the extent Mr. Lee raised an actual-innocence argument in his § 2255 petition, he referred to the "minimal probative value" of the "similar hair" testimony but did not mention anticipated DNA evidence excluding him as the source of the hair recovered from the FBI cap.   (Doc. 1118 at 6).   When Mr. Lee supplemented the § 2255 petition based on the mtDNA analysis excluding him as the source of the discovered hair, he specifically stated that the supplemental argument supported his ineffectiveness claim; he did not refer to an actual-innocence argument.   (Doc. 1139 at 1).

proceeded under § 3600(a) absent his agreement with the Government.  And in any event, as a matter of factual history, he did not.[11]

Because the statute does not require the Court to order the requested DNA testing, the only other source of such a requirement could be the Due Process clause.  Mr. Lee makes this argument too.  But I believe his view to be inconsistent with *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009).  Among other things, *Osborne* addressed whether the scope of access to DNA evidence and testing that Alaska affords to state prisoners seeking postconviction relief in its state courts violated the procedural due process requirements of the United States Constitution.  *See generally id.*  In addressing that issue, the Supreme Court went out of its way to hold up 18 U.S.C. § 3600 as a model for the type of statutory access to postconviction DNA testing that satisfies the limited liberty interest convicted persons have in this context.  *See id.* at 63 ("At oral argument, Osborne agreed that the federal statute is a model for how States ought to handle the issue."); *see also id.* at 70 (noting that Alaska's "procedures are similar to those provided for DNA evidence by federal law and the law of other States, *see, e.g.*, 18 U.S.C. § 3600(a), and they are not inconsistent with the 'traditions and conscience of our people' or with 'any recognized principle of fundamental fairness'") (citation omitted).

In light of *Osborne*, the Government has the better argument here.  "The dilemma [of] how to harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice" is a "task belonging primarily to the legislature."  *Id.* at 53.  Procedural

---

[11] It is also worth noting that § 3600(e) was not added to the statute until 2016.  Mr. Lee's position appears to be that the DNA testing results that came back in 2007 triggered § 3600(e)(1)(B) as soon as it was enacted.  My reading of § 3600(a) and (e) is a bit different.  I think that the law, as amended in 2017, requires that, if DNA testing is ordered pursuant to subsection (a) and that testing excludes the applicant as the source of the crime-scene DNA profile, then submission of the crime-scene DNA profile for an NDIS search must occur in immediate sequence, not thirteen years later.  Put another way, the adoption of subsection (e) did not trigger an obligation requiring courts to order a search of the NDIS based on DNA analysis from a decade earlier.

due process does not require the Court to order a comparison of the DNA profile of the hair at issue to other persons where such testing would be beyond the scope of 18 U.S.C. § 3600. Mr. Lee probably had a procedural due process right to the exclusionary test that was conducted in 2007. But he does not have a procedural due process right to try to match the hair to everyone involved in this case decades after he should have asked for any testing.

*First*, Mr. Lee has conceded that mtDNA testing, while a good exclusion tool, is more controversial as a matching tool. There is a risk of an erroneous match.

*Second*, with respect to Cheyne Kehoe, Kirby Kehoe, and Faron Lovelace, a match would mean next to nothing. All of these people had the opportunity to be near the FBI cap before and/or after the Mueller murders. (The cap was retrieved by law enforcement about a year after the murders.) If the small strand of hair in the cap belonged to one of them, that does not in any meaningful way make it more likely that the "matched" person took part in the Mueller murders. And even if it did, that doesn't make it any less likely that Mr. Lee was there as well.

*Third*, a criminalist at the Arkansas State Crime Laboratory, who was accepted as an expert in trace-evidence collection and hair and fiber analysis, testified that the hair was "microscopically dissimilar" to sample hairs from, *inter alia*, Paul Humphrey and Cheyne Kehoe. (Tr. 4723). She testified that, while her analysis did not permit her to positively identify the source, the testing allowed for exclusion. There is no information—let alone credible information—to suggest her exclusions were incorrect or that her method of comparison could not accurately exclude people.

*Fourth*, with respect to Paul Humphrey (who again I note was excluded by the criminalist's hair analysis), a match with him would not make it less likely that Mr. Lee was part of the Mueller murders as well. A match would make it more likely that Mr. Humphrey was also involved with the Chevie Kehoe organization. (Recall the FBI cap with the hair was found in Chevie Kehoe's

14

car.)  But it would not suggest that Mr. Humphrey was the killer instead of Mr. Lee or instead of both Mr. Lee and Mr. Kehoe.  And, contrary to Mr. Lee's suggestion, it would not somehow appreciably change a jury's evaluation of the timeline of the murders and Mr. Kehoe's and Mr. Lee's return to Washington.  Also contrary to Mr. Lee's suggestion, it would not rehabilitate Ms. Reid's testimony in some way that would change a jury's evaluation of the timeline of the murders and Mr. Kehoe's and Mr. Lee's return to Washington.  *Compare* (Doc. 1387 at 5, 13) *with* (Doc. 1398 at 23-25) (showing the unreliability of Ms. Reid's testimony regarding having seen Mr. Mueller and Mr. Humphrey together on January 18).

In light of all this, Mr. Lee can come nowhere close to showing that procedural due process somehow requires the DNA testing that Mr. Lee seeks, which is well beyond the scope of the applicable federal statute and is simply not material.  Because neither the statute nor the Constitution compel this Court to order the testing, Mr. Lee is left to argue that the Court should exercise its discretion to order the testing under the All Writs Act.  Even assuming I could do that, I believe the more proper exercise of my discretion is not to order this testing.

Factored into my analysis is all I have said above.  Plus, it weighs considerably on me that Mr. Lee has waited to make this Motion until 21 years after trial, 17 years after sentencing, 13 years after mtDNA testing excluded him as a match for the hair, and 4 years after the adoption of 18 U.S.C. § 3600(e)(1)(B) as an amendment to § 3600.  He has provided no excuse at all for this delay.  And it is impossible to ignore that he only filed this Motion after the setting of his execution date.  Issuing a discretionary order under the All Writs Act in these circumstances is unwise and unwarranted.  I will not do so.

Judge Eisele specifically found that the outcome of the case would not have been different if the jury had heard that Mr. Lee had been excluded as the source of the hair.  (Doc. 1163 at 49);

*Lee,* 2008 WL 4079315, at *25.  Commenting on the strength of the evidence, Judge Eisele, who presided over both the trial and § 2255 proceedings, also noted that, in addition to the "abundance of evidence supporting the guilt phase convictions," the "bare facts alone cannot convey the demeanor of the witnesses who testified, the scope and detail of the Government's evidence, or the general overall tenor of the case against Kehoe and Lee."  (Doc. 1163 at 17); *Lee*, 2008 WL 4079315, at *7.  Judge Eisele noted that, "[w]hile the bulk of the evidence related to Kehoe, the jury's conclusion that Lee was with Kehoe when the Muellers were murdered and that he participated in the murders was well-founded."  *Id.*  The evidence against Mr. Lee remains overwhelming today.  Mr. Lee has not come close to demonstrating that more DNA analysis would impact that conclusion.

## CONCLUSION

For the foregoing reasons, Mr. Lee's Motion to Order Comparison of DNA (Doc. 1387) is DENIED.

IT IS SO ORDERED this 11th day of July 2020.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE